UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

ANDREW ASHIEGBU,

    Plaintiff,

v.

ANDREW SAUL,

    Defendant.

Case No. 18-cv-06334-RMI

**ORDER**

Re: Dkt. Nos. 23, 25, 26

Plaintiff, Andrew Ashiegbu, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for supplemental security income under Title XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 9 & 11), and both parties have moved for summary judgment (dkts. 23, 25 & 26). For the reasons stated below, the court will grant Plaintiff's amended motion for summary judgment (dkt. 26), and will deny Defendant's motion for summary judgment (dkt. 25).

## **LEGAL STANDARDS**

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and direct courts in their review of

factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**PROCEDURAL HISTORY**

On May 16, 2015, Plaintiff filed an application for supplemental security income alleging disability beginning on September 1, 2011. *See* Administrative Record "*AR*" at 23.[1] The ALJ denied the application on September 21, 2017. *Id*. at 34. The Appeals Council denied Plaintiff's request for review on August 17, 2018. *Id*. at 1-5.

**SUMMARY OF THE RELEVANT EVIDENCE**

Plaintiff is a 61-year-old man who, despite having earned an undergraduate degree as well as an MBA, found himself, along with his wife and children, living in homelessness between 2013 and 2016. *See id*. at 1028-1029. During earlier periods of his life, Plaintiff worked as a hotel manager in Florida, and then as a restaurant manager in California. *Id*. at 1029. Thereafter, from 2000 until about 2010, Plaintiff became a successful businessman, operating his own businesses pertaining to real estate and mortgage brokerage matters, as well as immigration consultancy. *Id*. Things took a turn for the worse when he was initially investigated for aiding the commission of immigration violations; and then again, in 2010, when he and his wife were both convicted of mortgage fraud and sentenced to terms of imprisonment. *Id*. at 610, 1029. A few months after his release from incarceration, in October of 2013, Plaintiff was hospitalized for chest pain, and it was

---

[1] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #15. *See* (dkts. 15-1 through 15-23).

discovered that he was in dire need of coronary bypass surgery. *Id*. at 1029. While he was hospitalized for his various cardiac issues, Plaintiff also suffered a stroke that resulted in bleeding from his cerebral arteries, right-sided weakness, and memory impairment. *Id*. at 610, 1029. Due to his incarceration until early 2013, combined with his cardiac and cerebrovascular events later that year, Plaintiff and his family remained homeless until they were finally able to arrange for a place to live in November of 2016. *Id*. at 1028.

In addition to suffering from a plethora of serious physical impairments, twelve of which the ALJ found to be severe, Plaintiff was also twice diagnosed with adjustment disorder manifesting in anxiety and depression, which the ALJ merely referred to as Plaintiff's "anxiety and "depression," and found them to be non-severe.[2] *See AR* at 26-27, 610-12, 1033-36. Plaintiff's mental health was evaluated in 2015 and 2017 by two consultative examiners. In August of 2015, Plaintiff was referred to Mary Ann Vigilanti, Ed.D., by the state agency for disability determination; and, Dr. Vigilanti's findings and conclusions, based on a clinical interview and evaluation, were reduced to a 3-page report (the "Vigilanti Report"). *Id*. at 610-12. Thereafter, nearly two years later, Plaintiff was referred by his attorney to Katherine Weibe, Ph.D., for an evaluation geared toward determining his then-existing state of cognitive and emotional functioning; Dr. Wiebe's findings and conclusions were reduced to a 14-page report (the "Wiebe Report"). *Id*. at 1027-39.

In 2015, the Vigilanti Report noted that Plaintiff had received treatment for his depression, mood changes, sleeplessness, and fluctuation in his appetite. *Id*. at 610. While Plaintiff was still able to perform certain basic activities of daily life, such as taking care of his own hygiene, he was no longer able to drive, and could only stand for 20 minutes at a time. *Id*. at 611. During the evaluation, Plaintiff appeared "anxious and somewhat shaky . . . [and] seemed to be under physical/mental duress." *Id*. Further, while Plaintiff "had some difficulty with orientation,"

---

[2] "The Diagnostic and Statistical Manual of Mental Disorders (DSM-5) defines Adjustment Disorder as 'the presence of emotional or behavioral symptoms in response to an identifiable stressor . . . [which] may be a single event (e.g., a termination of a romantic relationship), or there may be multiple stressors (e.g., marked business difficulties and marital problems).'" *Dennis v. Davis*, No. 98-cv-21027-JF, 2017 U.S. Dist. LEXIS 208697 at *67 (N.D. Cal. Dec. 19, 2017).

manifesting confusion about the month, the day of the week, his age, and his location at the time, it was noted that some of Plaintiff's responses "appeared to be purposeful in their inaccuracies." *Id*. Nevertheless, the Vigilanti Report concluded with an Axis-I diagnosis of adjustment disorder with anxiety; and added that Plaintiff's depressed mood, and his worry and preoccupation with his medical conditions, "may interfere with his ability to get through a normal workday without interference from a mood disturbance and affect such things as concentration, task persistence and pacing . . . [as well as] interfere[ing] with his motivation and follow-through with work activities." *Id*. at 611-12.

The 2017 Wiebe Report was considerably more thorough and detailed than the Vigilanti Report. In addition to a clinical interview and evaluation, and the administering of nine diagnostic tests, the Wiebe Report's basis also included a review of Plaintiff's medical records from 2013 to 2016 from the Alameda Health System, Hayward Wellness Center, and Valley Care Medical Center, as well as a review of the 2015 Vigilanti Report. *Id*. at 1031-32. Initially, Dr. Wiebe noted that Plaintiff had been previously diagnosed in 2015 with adjustment disorder manifesting in depression based on the stressors of experiencing severe problems with occupation, housing, and finances. *Id*. at 1028. As to the results from the battery of diagnostic testing, it was noted that their validity was confirmed "due to the congruency of Mr. Ashiegbu's presentation, information from records reviewed . . . and the sensitivity of information that he shared about himself." *Id*. The Wiebe Report also cataloged Plaintiff's physical impairments as including type II diabetes with complications; cardiac murmur; chronic renal insufficiency; hypertension; hyperlipidemia; abdominal pain; visual impairment; left leg neuropathy and numbness; foot problems; coronary artery disease with sinus bradycardia; slurred speech; malaise and fatigue; left knee pain from a fall; syncope; nausea and vomiting; high cholesterol; left leg pain with an inability to lift the heel of that foot; urinary incontinence and distended bladder; moderate cardiomegaly; bilateral atelectatic changes in the lung bases; tachycardia; intermittent headaches; and, of course, Plaintiff's bypass surgeries on three coronary arteries, and his cerebrovascular stroke that caused brain bleeding and right-sided weakness. *Id*. at 1029-30.

By way of clinical observations, Dr. Wiebe described Plaintiff's mood as depressed and

noted that he also evinced anxiety and "was tearful at times." *Id*. at 1031. Further, Plaintiff "struggled with remote, recent, and immediate memory," as well as evidencing problems with attention and slow processing speed. *Id*. As to Plaintiff's test results, the Wiebe Report found limitations in seven areas pertaining to cognitive functioning, as well as two areas of emotional functioning. *Id*. at 1032-35. In all but two of the areas pertaining to cognitive functioning, Plaintiff was found to be severely impaired. *Id*. at 1032-33. Plaintiff's premorbid IQ (that is, his intellectual ability level before the onset of any disorders) was estimated to be in the high average range, and his sensory and motor abilities were considered to be only moderately impaired. *Id*. However, Plaintiff's performance on various diagnostic tests (including, Trails A & B; Clock Drawing Task; RBANS Coding Task; RBANS Attention Index; RBANS Immediate Memory Index; and RBANS Delayed Memory Index) indicated that he was severely impaired in the areas of attention, concentration, memory, executive functioning, language, as well as visual/spatial functioning. *Id*. Additional tests (Beck Depression Inventory and Beck Anxiety Inventory) indicated that in the areas of emotional functioning, Plaintiff "has severe depression . . . [and] that he is experiencing severe anxiety." *Id*. at 1033-34. Regarding the depression, Dr. Wiebe found that Plaintiff experiences feelings of guilt "over many things he has done or should have done," that he is disappointed in himself, that he has lost interest in everything and is unable to make any decisions, and that he "does not consider himself as worthwhile and useful . . . and feels like crying but cannot." *Id*. at 1033. On the other hand, Plaintiff's anxiety manifests in tingling and wobbliness in his legs, an inability to relax, fearing the worst, indigestion and abdominal discomfort, feeling faint and having cold sweats, as well as "mild problems with feelings of choking, and feeling shaky." *Id*. at 1034.

In the end, Dr. Wiebe opined that Plaintiff "would have difficulties being able to relate and communicate effectively and reliably with supervisors, co-workers, and the public in a work environment due to his psychiatric problems." *Id*. at 1036. Plaintiff's "depression and anxiety [] interact and combine with . . . severe cognitive functioning problems that are likely associated with his history of cerebrovascular accident." *Id*. Accordingly, the conclusion was that Plaintiff "would likely be unable to work on a full-time basis for two years." *Id*.

5

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that he has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation. *AR* at 24-25. At Step One, the claimant bears the burden of showing he has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 25. At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: cerebral artery occlusion with cerebral infarction; coronary artery disease; aortic stenosis; status post triple coronary artery bypass grafting; hypertension; hyperlipidemia; stroke; diabetes mellitus; degenerative disc disease of the lumbar spine; pulmonary effusion; reduced visual acuity; and obesity. *AR* at 25. On the other hand, while failing to evaluate Plaintiff's adjustment disorder, the ALJ found that Plaintiff's "depression and anxiety, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere." *Id*. at 26.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in

appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments. *AR* at 27-28. Next, the ALJ determined that Plaintiff retained the RFC to perform light work with some postural limitations and a requirement of no more than occasional changes in the routine work setting. *Id*. at 28-33.

At Step Four, the ALJ determined that Plaintiff is not capable of performing his past relevant work as a real estate broker. *Id*. at 33. Lastly, at Step Five, the ALJ concluded that based on the RFC, Plaintiff's age, education, and work experience, that there are jobs that exist in significant numbers in which Plaintiff can still perform, such as a residential leasing agent or a building consultant. *Id*. at 33-34. Accordingly, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 16, 2015, through the date of the issuance of the ALJ's decision, September 21, 2017. *Id*. at 34.

**DISCUSSION**

In pertinent part, Plaintiff argues that the ALJ erred in evaluating the medical evidence, leading to findings at Step Two and Three, as well as the RFC, that were not supported by substantial evidence. *See* Pl.'s Amend. Mot. (dkt. 26) at 7-15. Defendant argues that substantial evidence supported the ALJ's finding at Step Two that Plaintiff's mental impairments were not severe: because Dr. Wiebe found Plaintiff's overall intellectual functioning to be within the average range; because Dr. Vigilanti had posited that Plaintiff had purposefully given some incorrect answers during his 2015 evaluation; and, because two psychiatric consultants who had reviewed the Vigilanti Report had opined that Plaintiff had no more than mild limitations. Def.'s Mot (dkt. 25) at 7-8, 10. Noting that despite the fact that the ALJ found Plaintiff's mental impairments were not severe, Defendant suggests that "the ALJ did evaluate Dr. Wiebe and Dr. Vigilanti's opinions later in the decision [], including the functional limitations they endorsed,

7

curing any possible error." *Id*. at 9. Defendants then argues that the ALJ correctly gave the Wiebe Report little weight because "there was an internal inconsistency" between the finding that Plaintiff's overall intellectual functioning was in the average range while at the same time concluding that Plaintiff had various marked limitations. *Id*. at 10. Also, because elsewhere in the record, "Plaintiff was often described as pleasant or cooperative," or was observed at other times exhibiting a normal mood or being capable of paying attention, Defendant suggests that it was proper to disregard the limitations opined by Dr. Wiebe. *Id*.

The ALJ did not analyze Plaintiff's adjustment disorder at all – instead, the ALJ conflated the disorder with its symptomatic manifestations and evaluated the symptoms of depression and anxiety at Step Two in lieu of the adjustment disorder itself. *See AR* at 26 ("The claimant's medically determinable impairments of depression and anxiety . . . do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere."). In any event, finding only mild limitations in understanding, memory, information processing, interacting with others, concentrating, persisting, maintaining pace, adapting, and self-management, the ALJ claimed to have "give[n] Dr. Vigilanti's opinion great weight," while giving Dr. Weibe's opinion "partial weight," and giving "great weight" to the opinions of the non-examining state agency consultants who merely reviewed the Vigilanti Report and then opined that "Plaintiff had no severe mental impairment." *Id*. at 27, 32-33.

First, it is important to note that it would be an empty gesture to say that the Vigilanti Report was given "great weight" while at the same time ignoring its central diagnosis and then individually rejecting each of its findings as to Plaintiff's limitations. As stated above, the Vigilanti Report concluded with an Axis-I diagnosis of adjustment disorder with anxiety, and the ALJ failed to consider the underlying impairment at Step Two at all. Further, Dr. Vigilanti found that Plaintiff's depressed mood, as well as his anxiety about his medical conditions, "may interfere with his ability to get through a normal workday without interference from a mood disturbance and affect such things as concentration, task persistence and pacing . . . [as well as] interfere[ing] with his motivation and follow-through with work activities." *See id*. at 611-12. The ALJ casually dismissed Dr. Vigilanti's opinion regarding these limitations by focusing on the use of the word

8

"may," and stating only that "[t]his is equivocal." *See id*. at 31. Thus, it certainly does not appear that the Vigilanti Report was in fact given "great weight."

Second, it was error to give what was essentially controlling weight to the non-examining consultants from 2015 while essentially rejecting the limitations opinions of both examining consultants from 2015 and 2017. The ALJ's reasoning for rejecting the limitations expressed in the Wiebe Report were that the report presented "internally inconsistent" findings such as finding that Plaintiff functioned in the average range for his overall intellectual functioning while finding "marked limitations in multiple mental abilities and aptitudes needed to do unskilled work." *Id*. at 32. The ALJ concluded in this regard that Dr. Wiebe's limitations opinions were "inconsistent with minimal mental health treatment and the record as a whole, and it is inconsistent with the findings and opinion of Dr. Vigilanti." *Id*. As to the ALJ's reasoning that Plaintiff only received "minimal mental health treatment," the court notes that Plaintiff was either incarcerated or homeless during most of the period for which the ALJ faulted the "minimal" nature of his mental health treatment; hence, this reasoning is an unsound foundation on which to base the discrediting of the Wiebe Report. It is true that an ALJ may impugn credibility "based on an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). However, it is also true that disability benefits may not be denied based on a claimant's failure to obtain treatment he cannot afford. *See Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995). Moreover, courts are reluctant to "chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)); *see Garrison v. Colvin*, 759 F.3d 995, 1018, n.24 (9th Cir. 2014). Furthermore, the ALJ's suggestion that the limitations opined by Dr. Wiebe in 2017 were "inconsistent" with those opined by Dr. Vigilanti in 2015 is incorrect (they were not inconsistent) – and, even if the opinions were inconsistent, due to the passage of two years spent in homelessness, this would not constitute a legitimate reason for discounting the later opinion.

Accordingly, for a host of reasons, the ALJ committed reversible error in evaluating Plaintiff's adjustment disorder at Step Two and beyond. First, the ALJ failed to evaluate

9

adjustment disorder manifesting in depression and anxiety. Second, in evaluating Plaintiff's "depression and anxiety," the ALJ stated that the Vigilanti Report was given great weight, when such was not the case. Third, given that the limitations opinions of both Drs. Vigilanti and Wiebe were rejected, the ALJ's Step Two finding that Plaintiff's "mental impairments" were not severe rested only on the opinions of two non-examining consultants who did nothing more than review the Vigilanti Report. Thus, the ALJ's Step Two finding was not based on substantial evidence because it is well established that the opinion of a non-examining physician, standing alone, does not constitute substantial evidence. *See e.g.*, *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). Fourth, the ALJ's error in evaluating Plaintiff's adjustment disorder at Step Two infected the remainder of the sequential evaluation process. At Step Three, the ALJ failed to consider medical equivalency for any mental disorders, such as under Listing 12.15 (trauma and stressor-related disorders), let alone consider the combined effect of Plaintiff's twelve severe physical impairments in combination with his adjustment disorder. Finally, the ALJ formulated a RFC that gave no due consideration to the limitations imposed by Plaintiff's adjustment disorder, as opined by Drs. Vigilanti and Wiebe. Instead, the RFC only provided that Plaintiff "can adapt to occasional changes in routine work settings." *AR* at 28. Since there was no legitimate reason given by the ALJ for rejecting the limitations opined by Drs. Vigilanti and Wiebe, the RFC was likewise not based on substantial evidence.

If the ALJ believed that the limitations described in the Vigilanti Report were "equivocal," it was incumbent on the ALJ to take care that the record be developed such that Plaintiff's interests would be fairly considered, and such that a disability determination could be rendered on a complete record. The ALJ failed to do so in this regard. In fact, Plaintiff expressly asked the ALJ to conduct a supplemental hearing with a medical expert; the ALJ denied this request and maintained that "a medical expert is not necessary to reach a determination in this case." *Id*. at 23. Thus, it was error for the ALJ to reject the limitations expressed in the 2015 Vigilanti Report as "equivocal" while at the same time maintaining that "a medical expert is not necessary," an error which was compounded by rejecting the limitations expressed in the 2017 Wiebe Report on

1 grounds that they were internally inconsistent when they were not.

2 While it is true that claimants are ultimately responsible for providing sufficient medical evidence to establish a disabling impairment, it has nevertheless "long [been] recognized that the ALJ is not a mere umpire at [an administrative hearing], but has an independent duty to fully develop the record[.]" *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992, as amended Sept. 17, 1992) (*per curiam*); *see also Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1150 ("The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered.") (internal quotation marks and citations omitted). It is also important to note that "[t]he ALJ's duty to develop the record fully is [] heightened where the claimant may be mentally ill and thus unable to protect her own interests." *Tonapetyan*, 242 F.3d at 1150; *see also Higbee*, 975 F.2d at 562. In cases where the evidence is either ambiguous, or otherwise inadequate to permit a proper evaluation of a claimant's impairments, the ALJ has a duty to "conduct an appropriate inquiry[.]" *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996); *Tonapetyan*, 242 F.3d at 1150.

As to the proper discharge of the duty to fully and fairly develop the record, it may be done in any number of ways, including subpoenaing Dr. Vigilanti and/or Dr. Wiebe, or submitting questions to them by other means; by providing for the participation of a relevant medical expert at the hearing; or, by ordering another consultative evaluation geared specifically towards determining the parameters of the limitations caused by Plaintiff's adjustment disorder. *See Tonapetyan*, 242 F.3d at 1150. In short, pertaining to the rejected limitations opinions expressed in the Vigilanti and Wiebe Reports, "if the ALJ needs to know the basis of the doctor's opinion, he has a duty to conduct an appropriate inquiry." *Smolen*, 80 F.3d at 1288. Here, no such inquiry was conducted, at least none that could justify rejecting the limitations opinions of both examining doctors as to Plaintiff's adjustment disorder. On remand, the Commissioner is instructed to either give controlling weight to the work-preclusive opinions expressed in the Wiebe Report, or to sufficiently develop the record in light of the guidance provided herein.

11

Lastly, because the court is already remanding the case for further proceedings, the court finds it unnecessary to address Plaintiff's remaining two issues (alleged error in evaluating Plaintiff's credibility and the ALJ's denial of Plaintiff's request for medical expert testimony), with the exception that the court concludes that remand for immediate payment of benefits is not warranted. The court declines to address Plaintiff's remaining issues because both claims can be adequately addressed on remand, and because neither can secure for Plaintiff any relief beyond what is already being granted. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Gutierrez v. Comm'r of Soc. Sec.*, No. 18-cv-02348-RMI, 2019 U.S. Dist. LEXIS 165711, at *30-31 (N.D. Cal. Sep. 25, 2019); *Abdul-Ali v. Berryhill*, No. 18-cv-03615-RMI, 2019 U.S. Dist. LEXIS 138512, 2019 WL 3841995, at *7 (N.D. Cal. Aug. 15, 2019); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand."). On remand, the ALJ is instructed to consider the other issues raised in Plaintiff's briefing and modify the opinion as appropriate. *See Cortes v. Colvin*, No. 2:15-cv-02277-GJS, 2016 U.S. Dist. LEXIS 40580, 2016 WL 1192638, at *4 (C.D. Cal. Mar. 28, 2016); *Cochran v. Berryhill*, No. 3:17-cv-00334-SB, 2017 U.S. Dist. LEXIS 212380, at *21 (D. Or. Dec. 28, 2017).

## CONCLUSION

For the reasons stated above, Plaintiff's Amended Motion for Summary Judgment (dkt. 26) is **GRANTED**, and Defendant's Motion for Summary Judgment (dkt. 25) is **DENIED**. This case is **REMANDED** for further proceedings in light of the instructions provided herein.

**IT IS SO ORDERED.**

Dated: March, 23, 2020

ROBERT M. ILLMAN
United States Magistrate Judge